UNITED STATES DISTRICT COURT
for the
Eastern District of California

SEALED

FILED

JAN 2 9 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| Henry BENSON and | ) | |
| Roselle CIPRIANO | ) | **2: 1 9 - MJ - 0 0 2 4    KJN** |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about _____ July 2018 and January 2019 _____ in the county of _____ Solano _____ in the

_____ Eastern _____ District of _____ California _____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 846 and 841(a)(1) | Conspiracy to manufacture and distribute at least 50 grams of a mixture and substance containing methamphetamine and manufacture and distribution of at least 50 grams of a mixture and substance containing methamphetamine, a Schedule II Controlled Substance. |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Brian Nehring, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  Jan 29 2019

City and state:  Sacramento, CA

_____
*Judge's signature*

Kendall J. Newman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT, CRIMINAL COMPLAINT, AND ARREST WARRANT

I, Special Agent Brian Nehring of the DEA, being duly sworn, depose and state as follows:

### Purpose

1. This Affidavit is made in support of a search warrant for the residence and property located at **1169 Lewis Avenue, Vallejo, California.** This Affidavit is also submitted in support of a Criminal Complaint and Arrest Warrant charging the residents of this home, **Henry BENSON** and **Roselle CIPRIANO**, with conspiracy to manufacture and distribute at least 50 grams of a mixture and substance containing methamphetamine and manufacture and distribution of at least 50 grams of a mixture and substance containing methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 U.S.C. §§ 846 and 841(a)(1).

### Agent Background

2. I am a Special Agent of the Drug Enforcement Administration (DEA), San Francisco Field Division, and have been so employed since 1991. I have had numerous assignments since beginning with DEA, including being assigned to the Clandestine Laboratory Enforcement Team from 1997 to 1999, the Oakland Resident Office between 1999 and 2002, and the Mobile Enforcement Team (MET) between 2002 and 2004. I have been assigned to the Sacramento Division Office since September of 2004.

3. I have received specialized training in narcotic investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques and schemes, drug identification, and asset identification and removal, from the Drug Enforcement Administration (DEA). In addition, I graduated from the DEA Basic Agents Academy at the FBI Academy at Quantico, Virginia. In total, I have received in excess of 500 hours of comprehensive formalized classroom instruction in those areas outlined above.

4. I have assisted in the execution of more than four hundred (400) warrants to search particular places or premises for controlled substances and/or related paraphernalia, indicia and other evidence of violations of federal drug narcotics statutes. As a result, I have encountered and become familiar with various tools, methods, trends, and paraphernalia and related articles utilized by traffickers in their efforts to import, conceal, manufacture and distribute controlled substances. Central to all trafficking efforts, regardless of the drug, is the traffickers' effort to make a profit from those

1

dealings or transactions, either for the purchase of additional substances or material gain. I have been actively involved as case agent in excess of two hundred (200) investigations and have talked with confidential informants involved in the trafficking of narcotics, and this has formed the basis of my opinions.

5. I have been qualified as and have testified as an expert witness in both federal and state court in the Northern and Eastern Districts of California and in counties including Alameda, Contra Costa, Solano, Sacramento and others. These areas of qualification have included possession for sale, possession with intent to distribute, manufacturing of a controlled substance and cultivation.

## **Statement of Probable Cause**

6. Beginning in late 2017, I began an investigation of the methamphetamine and counterfeit tablet distribution operation of Rafael RUIZ Jr. of Vallejo, California.

7. During the course of this investigation, I spoke to Detective Sgt. Fabio Rodriguez, Sgt. Jerome Bautista and Sgt. Robert Knight of the Vallejo Police Department. I learned that an individual named Rafael RUIZ Jr. had been the subject of multiple narcotics investigations in Vallejo and Solano Counties in recent years and had been identified as a street gang associate and drug trafficker. Detectives related to me that RUIZ had been arrested in Vallejo in both 2016 and 2017 during vehicle stops and was found in possession of small amounts of methamphetamine, MDMA, and Oxycodone tablets, as well as large amounts of US Currency. In February 2017, RUIZ (who was on probation for a 2013 felony conviction for Possession of a Controlled Substance for Sale that resulted in a 72-month prison commitment) was found in possession of over $10,000 on his person as well as suspected MDMA and Oxycodone tablets during a traffic stop and was arrested.

8. I subsequently learned from Vallejo PD Sgt. Jerome Bautista that he had conducted the investigation of RUIZ in 2013 that led to RUIZ's arrest, the seizure of approximately 3000 suspected MDMA tablets and firearms, his conviction for Possession of a Controlled Substance for Sale (California Health and Safety Code Section 11378), and his subsequent incarceration in state prison for several years.

9. Between November 2017 and March 2018, I obtained a large amount of suspected MDMA tablets (several thousand tablets) from two drug distribution partners from Vallejo, California, with whom I met in an undercover capacity. These tablets were subsequently analyzed by the DEA Western Regional Laboratory and found to be over 500 grams (multiple kilograms in total) of a substance and mixture containing

2

Methamphetamine. The Forensic Fingerprint examiner located multiple of Rafael RUIZ Jr.'s fingerprints on the bags that contained the drugs.

10. On June 14, 2018, while acting in an undercover capacity, I was introduced to RUIZ as a potential customer for the counterfeit MDMA tablets he was distributing at the Safeway Store at Georgia Street and Highway 80 in Vallejo, California. Officers conducting surveillance observed RUIZ depart his nearby residence in Vallejo and travel to the Safeway Store. At this time, RUIZ entered my vehicle and produced approximately 1000 yellow tablets bearing a Kool-Aid form (the Smiling Pitcher) and an additional 50-100 tablets in the form of Donald Trump's Face with "Trump" stamped on the back. RUIZ sold me these tablets for $2000. RUIZ told me that he had a friend who possessed a pill press and "stamps" to create the pill shapes. RUIZ also told me that his friend had many thousands of new Donald Trump pills available and that RUIZ had spoken to his friend and would be meeting him that evening to obtain additional Donald Trump pills if I was interested. RUIZ indicated he could also supply Xanax and Oxycodone tablets. RUIZ provided me with his number, (707) 373-0696, at which he could be contacted directly to obtain additional pills whenever I was interested.

11. Between June 15 and July 3, 2018, I engaged in repeated narcotics related calls and text messages with RUIZ at (707) 373-0696, during which I arranged to purchase 2000 methamphetamine tablets on July 3, 2018 for $3000.00. During these calls, RUIZ indicated repeatedly that he was speaking to his friend who was manufacturing the tablets and was relaying messages to me from this person, including the variance in prices this individual was willing to supply based on how many pills were purchased at a time and the relative quality of the different types of pills. I also discussed obtaining samples of Xanax tablets from RUIZ, which he indicated were counterfeit but which he said he could also provide in 1000-count quantities.

12. On the morning of July 3, 2018, I contacted RUIZ just before 11:00 a.m. and arranged to meet in an hour or two in Fairfield, California. RUIZ indicated he was contacting his source and was going to get the tablets and would meet me in Fairfield at a Chevron Gas Station on North Texas Street. RUIZ subsequently arrived at approximately 1:00 p.m. in a silver 2006 Mercedes Benz sedan which was found to be registered in his name and which he indicated he had just purchased. I entered RUIZ's vehicle, and he provided me with the approximately 2000 tablets (915 gross grams) which consisted of yellow Tesla emblem, yellow Donald Trump face, and blue Minion shaped tablets. I paid him $3000.00 in exchange for the pills. I noted that these pills included the same imprint/color tablets as I had previously purchased from individuals prior to meeting RUIZ, as described above, which had been analyzed as containing methamphetamine. During this meeting, RUIZ told me he had

3

believed that his pill source had placed the samples of the Xanax tablets in the bag with the methamphetamine tablets. In my presence, he placed a call to an individual and I listened as he asked this person about the Xanax tablets. I heard this person relate that they would be ready in a few days. After this call, RUIZ told me that his friend manufactured the methamphetamine tablets and the Xanax tablets and that his friend would provide RUIZ with 20,000 of the methamphetamine tablets at a time on a "front," *i.e.*, without initial payment, if RUIZ asked. I was subsequently informed by the DEA Western Regional Laboratory that the blue Minion shaped tablets were analyzed s being nine-hundred and sixty nine (969) tablets weighing 354.1 grams and were a substance and mixture containing Methamphetamine and Caffeine. The remaining approximately 1000 tablets purchased that day have not yet been analyzed.

13. Analysis of the tolls for RUIZ's telephone for July 3, 2018, showed that at the exact moment RUIZ called his pill manufacturing source in my presence, RUIZ's telephone (707) 373-0696 placed a call to a cellular telephone (707) 305-6823, hereinafter referred to as TARGET CELLPHONE 1. Tolls showed that RUIZ was in contact with TARGET CELLPHONE 1 immediately after I called him that same morning and between that time and coming to meet me to deliver the pills. Toll analysis further showed that RUIZ had been in contact with the TARGET CELLPHONE 1 on several occasions leading up to July 3, 2018, when he had indicated to me that he had spoken to his tablet manufacturing source of supply.

14. Intelligence Analyst (IA) Matt Kregor informed me that TARGET CELLPHONE 1 was a pre-paid AT&T cellphone activated on May 1, 2018 in the name of "Mack Cheese" at 1017 Alamo Drive, Vacaville, California, and that since being activated it had been the highest frequently called number by RUIZ. IA Kregor further related to me that prior to the activation of TARGET CELLPHONE 1, RUIZ's telephone had been in contact with prior pre-paid cellphones, which had all been subscribed with an address of 1017 Alamo Drive, Vacaville, California, and that these phones had all been RUIZ's highest frequently contacted numbers at any given time and the calling patterns of these phones closely matched. This led IA Kregor to believe that the same person, including the then-current user of TARGET CELLPHONE 1, had used these pre-paid fake name cellphones in succession in order to avoid detection or identification by law enforcement, despite consistently using the same subscriber address linking them.

15. I subsequently obtained a GPS phone locator ping search warrant for TARGET CELLPHONE 1 authorized by the Honorable Magistrate Judge Carolyn Delaney on July 13, 2018. I began receiving phone locator information for this telephone soon thereafter, which showed that the telephone appeared every evening (and most days) to be located at 1169 Lewis Avenue, Vallejo, California.

16. I learned that 1169 Lewis Avenue, Vallejo, California was consistently provided as the associated addresses of both Roselle CIPRIANO and Henry BENSON per multiple credit header databases. I also learned per business records that this was also the listed site of the GENESIS CARE HOME FOR THE ELDERLY, and that Roselle CIPRIANO was listed as the owner. I also learned that Roselle CIPRIANO and Henry BENSON were listed per marriage license as having been wed in Nevada in 2003, and that both were licensed elder care providers by the State of California. Both CIPRIANO and BENSON currently supply a resident address of 164 Robles Way, Vallejo, California to the California DMV. I noted that 164 Robles Way, Vallejo, California is the address of the Glenn Cove Mailbox Center, a commercial mail box company business located in a shopping complex a very short distance away from 1169 Lewis Avenue, Vallejo, California. I also noted that RUIZ had been observed traveling directly from his residence to this same shopping center where he was observed meeting with someone before coming to deliver the suspected methamphetamine tablets to me on June 14, 2018.

17. In 2008, I conducted an investigation of individuals in Vallejo who were members of a local gang and who were believed to be engaged in the distribution of multiple drugs, primarily MDMA tablets. I purchased large amounts of MDMA tablets from a particular individual, Michael LOTT, beginning in 2008 through 2009 leading to a Title III wire intercept in early 2010. At the beginning of this investigation, I identified LOTT's initial MDMA source as Marico WHITEMON, also of Vallejo. In September 2008, I purchased approximately 2000 MDMA tablets from LOTT who arranged to meet me directly across the street from WHITEMON's apartment complex in Vallejo as he had done previously. Agents observed LOTT and WHITEMON together in the apartment complex immediately before the transaction and during the time LOTT indicated he was about to obtain the MDMA tablets. Agents observed LOTT and WHITEMON meet with an arriving SUV registered per DMV at that time to Roselle CIPRIANO and driven by an unidentified Filipino female adult and in which an unidentified Black Male adult was the passenger. They also observed WHITEMON and LOTT obtain a bag from the occupants of this vehicle, which LOTT subsequently delivered to me across the street and which contained the tablets subsequently analyzed as MDMA. I learned at the time that WHITEMON had previously listed mutual addresses with CIPRIANO and BENSON. Shortly after this time period, WHITEMON was shot to death, a murder which has never been solved, and LOTT began obtaining MDMA from another source in 2009 and 2010 who was identified and ultimately arrested. It was clear at the time that the occupants of the SUV registered to CIPRIANO had delivered the MDMA to

5

WHITEMON and LOTT, and I believe these two individuals were Roselle CIPRIANO and Henry BENSON.

18. In July 2018, I spoke with Customs and Border Patrol (CBP) Tactical Analytical Unit Intelligence Analyst Ryan Santino. IA Santino related to me that in 2018, he researched addresses/consignees in the Vallejo area that share similar indicators for illicit pill manufacturing. IA Santino learned that 164 Robles Way, #253, Vallejo, California was a commercial mail drop box located within the Glenn Cove Mail Box Center, which had received recent imports that were indicative of pill manufacturing. Per the vendor, the mailbox was registered to Roselle CIPRIANO. In 2018, this mail box received multiple import shipments. One shipment was from a Canadian Company, Test Kits Plus, which is a distributer of narcotics test kits, to include kits for MDMA, Opiates, and Fentanyl. This was shipped to "Samantha Wright." The second shipment was manifested as "Sports Supplement" from a British company "Blackburn Distributions." Blackburn Distributions is a distributor of sports supplements and tablet production ingredients to include microcrystalline cellulose, caffeine powder, and magnesium stearate, which are binding agents for pill manufacturing. This parcel's manifested consignee was "Samantha Right." It is believed Samantha Wright/Right are fictitious names, as research was unsuccessful in identifying an actual person with those names connected to 164 Robles Way, Vallejo. The last shipment of 5 kilograms of "Sports Supplement" was shipped from "Blackburn Distributions" to "Samantha Wright" at this mail box on July 5, 2018. IA Santino related that on July 24, 2018, an additional shipment from this same company of 10 kilograms of "Sports Supplement" had been shipped to this same mailbox with CIPRIANO listed as the consignee.

19. Further investigation by IA Santino showed that CBP records reflected that BENSON was listed on CIPRIANO's Passport Application as her husband and that Sharon HENDERSON was listed as CIPRIANO's mother-in-law. I know that Sharon HENDERSON, AKA Sharon BENSON, is listed per multiple database inquiries as providing both 1169 Lewis Avenue, Vallejo, California and 164 Robles Way, Vallejo, California as her most recent resident addresses to the California DMV and that she is listed as BENSON's mother. Per CBP records, both CIPRIANO and HENDERSON have had multiple imported packages shipped to them as consignees at mailboxes at the Glen Cove Mail Box Center at 164 Robles Way, Vallejo, California over recent years. Many of these packages were from companies in China which have been identified as having had parcels originating from them seized and found to contain items associated with pill manufacturing. In fact, Sharon HENDERSON had previously had an international mail parcel seized by CBP in 2013 which had been shipped to her at 164 Robles Way, Vallejo, California from

6

"Guang Zhou Zai Gao Co. LTD," which was listed as "hardening agent" and which was found to contain 1,107.5 grams of a substance analyzed as Fluoro-Amphetamine. HENDERSON also had an international package shipped in her name to this address from "Ruian Xintai Printing Machinery" in 2017, which was listed as "Spare parts packaging Machine." This company had previously been identified by CBP as a shipper of capsule filling machinery. HENDERSON had four additional packages shipped to her from China to 164 Robles Way, Vallejo, California since 2016, including two in June of 2018. CIPRIANO also has had seven additional international packages shipped to her at this mailbox from abroad during 2018, including in May 2018, at which time CIPRIANO received an international shipment at this mail box from "Wang Wei Jie," which was listed as .28 kg of "Coats." This business (Wang Wei Jie) was linked to seized pill press parts imported into the US in March 2018 and to prior illicit pill press investigations.

20. Based upon all the above, I formed that belief that BENSON, his wife CIPRIANO and his mother, HENDERSON were actively involved in the importation of chemicals and equipment utilized in the illicit manufacturing of counterfeit tablets containing various drugs; that they are currently (in 2018) manufacturing counterfeit tablets containing various narcotics; that they had been involved in the distribution of similar tablets as far back as 2008; and that they were supplying RUIZ with all of the tablets he was supplying to me and to others that I had purchased.

21. In late July 2018, I engaged in recorded calls and text messages with RUIZ during which I arranged to purchase 2000 counterfeit Xanax tablets on July 27, 2018, in Vallejo, California. RUIZ indicated that these pills were being supplied by his same pill source. That day, agents established surveillance of both RUIZ's residence on Elmwood Avenue in Vallejo as well as 1169 Lewis Avenue, Vallejo, California. I called RUIZ to inform him I was on my way to meet him, and he indicated he was calling his source to obtain the pills. Toll analysis showed that following my calls, RUIZ immediately contacted TARGET CELLPHONE 1. Shortly thereafter, SA Lashchuk observed a dark blue Nissan sedan, California license plate #8HDY470, depart 1169 Lewis Avenue, Vallejo (where TARGET CELLPHONE 1 was pinging at that time) and travel to RUIZ's residence. There, Vallejo PD Detective Barreto observed that the driver of the vehicle was BENSON. BENSON walked down the side of the house to where RUIZ's silver Mercedes Benz was parked. He opened the passenger door and leaned in for a time before returning to his vehicle. RUIZ then indicated he was ready to meet with me.

22. I subsequently met with RUIZ and purchase the initial 2000 tablets that appeared entirely consistent in shape, color and appearance with Xanax, but which RUIZ made clear were counterfeit tablets manufactured by his source. I then indicated to RUIZ

that I had enough money remaining to purchase an additional 800-900 Xanax tablets.
RUIZ indicated he would call his source in my presence to see if they were available.
Again, RUIZ's telephone contacted TARGET CELLPHONE 1. RUIZ then stated he
could meet with his source again and obtain the additional tablets. Surveillance
followed RUIZ, and he ultimately was observed again by SA Lashchuk and Det.
Barreto meeting with the same blue Nissan occupied by BENSON in the middle of a
street where BENSON was observed handing RUIZ an item through the window.
RUIZ then returned immediately directly to the Safeway store to meet me again and
supply me with the additional counterfeit Xanax tablets he indicated he had just
obtained from his source of supply. RUIZ indicated that he was also capable of
supplying multiple ounce quantities of heroin from another source separate from his
pill source of supply.

23. Inquiries with DMV showed that the 2018 Nissan with California License
#8HDY470 was registered to Hertz Rental Car. Subpoenas to Hertz Rental Car
showed that on July 27, 2018, this vehicle was rented in the name of Sharon
HENDERSON, BENSON's mother. I was informed by Intelligence Analyst Matt
Kregor that Hertz Rental Car records revealed that HENDERSON had routinely
rented Hertz Rental Vehicles, including this one, for months at a time.

24. The DEA Western Regional Laboratory analyzed the counterfeit Xanax tablets
purchased on July 27, 2018 and determined them to be approximately 797 grams of a
substance and mixture containing methamphetamine and caffeine.

25. During August and early September 2018, I engaged in additional recorded narcotics-
related calls and text messages with RUIZ, during which I discussed obtaining both a
quarter pound of heroin and several thousand additional counterfeit MDMA tablets
containing methamphetamine and counterfeit Norco tablets. RUIZ had previously
sent me pictures of the Norco tablets that he claimed he could obtain. RUIZ told me
he had recently obtained a large amount of counterfeit MDMA tablets from his pill
source which he would be willing to supply me with as well as the Norcos. Toll
analysis continued to show RUIZ in high-frequency contact with TARGET
CELLPHONE 1 before and after contacts with me. I told him that I needed to first
obtain the quarter pound of heroin from him on September 4, 2018, that we had
previously arranged, and that I would return either the same day or in subsequent
days to purchase the counterfeit MDMA and Norcos. I arranged to meet RUIZ that
day at the same Safeway Store at the Georgia Street exit of Highway 80 to purchase
the heroin. At that time, RUIZ initially met me and provided me with samples of the
counterfeit MDMA tablets. Shortly thereafter RUIZ's cousin, Edgar TORRES,
pointed a firearm at me and he and RUIZ stole the money I brought to purchase the
heroin. TORRES and RUIZ were arrested together shortly thereafter at a nearby

8

location in Vallejo at which time the money and RUIZ's cellphone (707-373-0696) were recovered. A search warrant was served at RUIZ's residence. 695 grams of suspected counterfeit MDMA tablets, which tested presumptive positive for methamphetamine, were seized. The firearm used in the robbery was later recovered from the dog house in the rear yard of the home. I was subsequently informed by the DEA Western Regional Laboratory these tablets were analyzed as approximately 640 grams of a substance and mixture containing Methamphetamine and Caffeine.

26. RUIZ ultimately agreed to speak to me on September 7, 2018 with his attorney in hopes of receiving consideration with regards to his pending federal drug distribution and robbery charges. RUIZ provided the following information in summary.

27. RUIZ related that he had known an individual known to him as both "Hank" and "Blink," whom he subsequently identified from a DMV driver's license photograph as Henry BENSON, for many years. RUIZ related that BENSON had supplied him with MDMA since approximately 2012 and he had observed him with up to 20,000 tablets at a time in the past. RUIZ related that BENSON had supplied him with the MDMA tablets he had been arrested and convicted of possessing in 2013. RUIZ stated that BENSON was married to a Filipino female whom almost always accompanied him and who had delivered pills on BENSON's behalf to RUIZ in the past. RUIZ identified a DMV photograph of CIPRIANO as BENSON's wife. RUIZ related that BENSON also supplied him with 100-count quantities of counterfeit pharmaceutical tablets to include Norcos, Oxycodone, Xanax, and others in the past and that although he had not seen BENSON manufacture tablets, BENSON had discussed manufacturing the tablets and had mentioned obtaining the "stamps" to make them.

28. RUIZ stated that all of the counterfeit MDMA tablets he had sold me had been supplied by BENSON and his wife. RUIZ told me that BENSON and his wife lived at a residence he identified from a Google Maps Satellite photo as 1169 Lewis Avenue, Vallejo, California. RUIZ related that BENSON and CIPRIANO operated an "old folks home" at this site and that BENSON would many times have RUIZ meet him at this location to obtain the pills, as BENSON would be too busy to leave, or would have RUIZ meet him at the nearby Safeway Shopping Center where the Mail Box Center was located. RUIZ also stated that BENSON would sometimes have an older Black Female adult whom he believed was BENSON's mother or sister deliver the pills to RUIZ, and that this female would always be in a rental car, as would BENSON. RUIZ tentatively identified a photograph of HENDERSON as BENSON's relative. RUIZ stated he would sometimes be directed to her residence in Fairfield, California to pick up tablets as well.

9

29. RUIZ identified TARGET CELLPHONE 1 saved in the memory of his telephone under "BB" as belonging to BENSON. RUIZ related that he had used this number to contact BENSON to arrange for the delivery of the tablets in July 2018 as well as to obtain the tablets seized from his residence on September 4, 2018, which he had planned on delivering to me. RUIZ stated that he had attempted to obtain the heroin I had requested but when it became clear that he could not, he had allowed his cousin to rob me for the money because he believed he was going to be going to jail shortly on other pending state charges and would be gone. During this interview, RUIZ's telephone received calls from TARGET CELLPHONE 1 and text messages inquiring about RUIZ's whereabouts. I learned that as of October 1, 2018, TARGET CELLPHONE 1 was still in use per toll records (*i.e.*, it was receiving calls).

30. I obtained a search warrant to search RUIZ's telephone on September 17, 2018, authorized by the Honorable Magistrate Judge Carolyn Delaney. During a search of the telephone, I examined the SMS text messages saved in the telephone, in particular looking at the dates leading up to the tablet purchases on July 3, 2018 and July 27, 2018 from RUIZ, as well as the days leading up to September 4, 2018 and the seizure of tablets from his residence. It was clear to me from the content of the text messages that RUIZ was contacting BENSON at TARGET CELLPHONE 1 using text messages to arrange and discuss these transactions. The text messages show that leading up to July 3, 2018, RUIZ identified me to BENSON at TARGET CELLPHONE 1. He told BENSON that I was the person from the city where I represented I lived and as the person who wanted the additional tablets. He also told BENSON that I did not want as many of the "faces," *i.e.*, Donald Trump face tablets, as I received the previous time, to which BENSON responded over TARGET CELLPHONE 1 that they would be "Mino" and "Tes," *i.e.*, the Minion and Tesla shaped tablets RUIZ delivered on that date. RUIZ also sent a screen shot of the text messages between him and me to TARGET CELLPHONE 1 prior to the September 4, 2018 transaction. He also related to BENSON in texts that I was indicating I was going to leave soon if the pills were not delivered. There was an extended series of back-and-forth texts between RUIZ and BENSON on July 27, 2018 (the date the counterfeit Xanax tablets were purchased) that were initiated by RUIZ within minutes of me contacting him on that date. This series of text messages started with the following text to TARGET CELLPHONE 1: "U around? This nigga pullin up u got those." BENSON then sent RUIZ texts that he was pulling up ("wya im here") at the approximate times he was observed meeting with RUIZ and telling him to stall me ("tell em u got em already"). In the days leading up to RUIZ's arrest on September 4, 2018, RUIZ contacted me beginning on September 1, 2018 to advise me he had obtained the tablets for me. There were text messages on RUIZ's phone from BENSON at TARGET CELLPHONE 1 to RUIZ ("wya," *i.e.*, where you at) followed by RUIZ contacting me to determine when I would come to get those pills. There

10

were text messages from me assuring RUIZ that I would be there in about three days, and then text messages from BENSON from TARGET CELLPHONE 1 a short while later "they b lying" and "im shure." On the evening of September 3, 2018, immediately after I spoke to RUIZ about obtaining Norco tablets the following day, and after he indicated he would contact his source, RUIZ sent a text message to BENSON at TARGET CELLPHONE 1: "No sandwiches?" I believe this was in reference to non-text message calls and conversations between the two phones wherein RUIZ was inquiring as to the availability of the Norcos.

31. In early October 2018, I was again contacted by CBP IA Santino who related to me that Blackburn Distributions in England was shipping a package listed as 10 kg (22 pounds) of "Sports Supplement" via DHL commercial delivery service to Roselle CIPRIANO at the Glen Cove Mail Box Center, and that it was due to be delivered on October 3, 2018. I verified that this package cleared customs inspection and arrived in the United States and was delivered at approximately 4:00 p.m. on October 3, 2018 to the Glen Cove Mail Box Center by DHL, and was signed for by an employee.

32. On October 4, 2018, I conducted surveillance of 1169 Lewis Avenue, Vallejo, California, which is a very large structure located on a dead-end cul-de-sac at the top of a hill off of Lewis Avenue, and at the nearby Glen Cove Mail Box Center in the shopping complex at 164 Robles Way, Vallejo, California approximately 400 yards east. I observed that there was a 2018 white Nissan Pathfinder parked at the dead-end in front of the residence next to a white Chrysler mini-van and a dark colored Nissan 4-door sedan. I noted that the 2018 white Nissan Pathfinder was a Hertz Rental Car per DMV records and that although I could not clearly read the plate on the dark colored Nissan Sedan, it appeared similar to the Hertz Rental Car rented in HENDERSON's name, which BENSON used to deliver the tablets to RUIZ previously. I also learned per DMV records that the white Chrysler mini-van was registered to Sharon HENDERSON at 164 Robles Way, Vallejo, California (the mail box address). I subsequently observed an individual I recognized from a DMV driver's license photograph as HENDERSON drive the white 2018 Nissan Pathfinder rental vehicle to the nearby shopping center at 164 Robles Way where she entered the Safeway and where I observed her at the teller window for the Wells Fargo Bank kiosk inside for several minutes. I then observed her drive directly across the lot to the Chase Bank where she entered and approached the teller window for a time before leaving the lot in the white Nissan Pathfinder and returning to 1169 Lewis Avenue.

33. I learned from PG&E that utilities service at 1169 Lewis Avenue, Vallejo, California is currently subscribed in the name of Christina BENSON, a listed relative of Henry BENSON and Sharon HENDERSON (BENSON). Christina BENSON has provided the same listed resident addresses as these individuals in the past per multiple

11

database inquiries, with a contact cellular telephone number of (415) 548-3336, and had been so since 2009. Inquiries with T-Mobile revealed that (415) 548-3336 is a cellular telephone subscribed in the customer name of Sharon HENDERSON and the subscriber name of GENESIS CARE HOME at 1169 Lewis Avenue, Vallejo, California and that this cellular telephone is currently active. I noted that HENDERSON has provided this contact number repeatedly in recent years. I also learned from CBP records that this same cellular telephone number was listed in the manifest of the seized parcel containing the 1.1 kilograms of seized Fluoro-Amphetamine in 2013.

34. On October 15, 2018, I verified with the refuse company who provided refuse service to 1169 Lewis Avenue, Vallejo, California that this was the normal day refuse service was provided to that location. I arranged with the company representative to switch out the company owned cans provided to that property occupants that had been placed that day in front of the property with empty cans and to bring those cans unopened to the company yard where they were turned over to me. I subsequently conducted a search of the refuse contained in these cans. During this search I located receipts, indicia, and paperwork addressed to 1169 Lewis Avenue and in particular, numerous shipping packages addressed to Roselle CIPRIANO and packages addressed from China. I also located a paper bag containing a clear plastic ziplock bag further containing a light green powdery residue that appeared to be the same color as some of the Methamphetamine tablets I had purchased from RUIZ that he had claimed had been supplied by BENSON and CIPRIANO, and which I suspected of being pill binder/residue. I submitted this item to the DEA Western Regional Laboratory and learned that it was analyzed as containing methamphetamine and caffeine, the same constituents as the clandestinely manufactured tablets.

35. I was advised by the Forensic Fingerprint Examiner at the Western Regional Laboratory in November 2018 that the bag that had contained the counterfeit Xanax tablets analyzed as methamphetamine that RUIZ sold to me in July 2018 bore a fingerprint which when analyzed was found to match that of Roselle CIPRIANO. These are the same tablets that BENSON was observed delivering and which RUIZ claimed he received from BENSON and CIPRIANO immediately prior to delivering to me.

36. I was subsequently advised by IRS Kregor that per toll analysis, use of TARGET CELLPHONE 1 appeared to be discontinued by October 1, 2018. By examining the tolls of the three highest-frequently contacted numbers by TARGET CELLPHONE 1, IRS Kregor identified a new cellular telephone, 707-679-8460, hereinafter referred to as TARGET CELLPHONE 2, with which these numbers all began having high-frequency contact at approximately the same time. These three numbers shared no

other common contact number, and contact with this number started at the same time as contact with TARGET CELLPHONE 1 ceased. TARGET CELLPHONE 2 is a pre-paid T-Mobile provided telephone initiated on September 28, 2018 in the name of Garrett Morgan at 212 Morgan Street, Suisun City, California. IRS Kregor verified that this is a legitimate address but that there is no record of a Garrett Morgan existing in the area or ever having listed that address. IRS Kregor further verified that TARGET CELLPHONE 2 shares at least 25 common contact numbers with BENSON's prior number (TARGET CELLPHONE 1). This, combined with the fact that this number became active on the same day that the previous number appeared to become inactive, it is highly likely that TARGET CELLPHONE 2 is the current number BENSON is using to continue his criminal activities.

37. Based upon the above, I believe that BENSON is currently using T-Mobile cellular telephone (707) 679-8460 (TARGET CELLPHONE 2) to facilitate his ongoing narcotics trafficking activities.

38. Based on the foregoing, I believe BENSON and CIPRIANO have committed violations of Title 21 U.S.C. §§ 841(a)(1) and 846, manufacture and distribution of at least 50 grams of a mixture and substance containing methamphetamine, and conspiracy to do so. I also believe BENSON and CIPRIANO are residing at and using the residence located at 1169 Lewis Avenue, Vallejo, California, described in Attachment A, to facilitate these crimes and that the items described in Attachment B, evidence of these crimes, can and will be located at this property.

## Affiant's Experience Regarding Items to be Seized

39. Based on my training and experience and consultations with other federal, state, and local law enforcement personnel, I believe the following to be true:

40. I have learned from my training and experience that traffickers who engage in the manufacture of counterfeit pharmaceutical tablets or tablets containing controlled substances or dangerous drugs, often have at their residence or areas under their control, controlled substances or dangerous drugs, including Methamphetamine in this case; binders and other chemicals used in combination with controlled substances to create counterfeit pharmaceutical tablets or tablets containing controlled substances or dangerous drugs; pill presses; parts for pill presses; dies and molds, mold trays, tables, measuring devices, grinders, mixers, storage containers, and similar items used in the creation of chemical mixtures and the pressing of the mixtures into tablets; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting and cutting agents; narcotics packaging materials,

13

including plastic, tin foil, cellophane, jars, plastic bags and containers; and surgical gloves.

41. Persons involved in the distribution of controlled substances often maintain at their residences, outbuildings, secondary residences, businesses, and vehicles, quantities of controlled substances, as well as paraphernalia for manufacturing, use, packaging, and distribution of controlled substances. Drug traffickers also maintain records relating to their trafficking activities in these same places. These records include personal calendars, address/telephone books, and papers reflecting the names, addresses, pager, telephone, and fax numbers relating to their drug trafficking associates. These records can be in written form. Drug traffickers also keep stored messages and telephone numbers relating to their trafficking activities within electronic pagers and/or beepers. Further, drug traffickers often keep photographs and audio/video recordings depicting themselves and their associates, as well as their assets and controlled substances. They may also keep electronic equipment used for counter surveillance including scanners, cameras, monitors, and anti-bugging devices.

42. Premises and vehicles used by individuals involved in drug dealing usually contain articles of personal property showing the identity of persons occupying, possessing, residing in, owning, frequenting, or controlling the premise or property.

43. Persons involved in the distribution of controlled substances often maintain records and ledgers listing their trafficking activities in these same places. These records are kept to keep track of the ordering, purchasing, storage, distribution, and transportation of controlled substances. After drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, track the status of accounts receivable and accounts payable, and to record the names and telephone numbers of suppliers, customers and co-conspirators. These records are often maintained not only on paper, but also as electronic or digital data in the form of computer hardware and software.

44. Individuals involved in drug trafficking often use telephones, cellular telephones, electronic pagers, beepers, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business. Individuals involved in drug trafficking must often rely on others to obtain drugs and to help obtain, market, distribute, and/or protect drugs. To achieve some of the aforementioned objectives, I am aware that drug distributors will often, among other methods, have a courier transport drugs or drug proceeds or ship controlled substances/drug proceeds through the mail or by common carrier. Evidence related to the identities of these co-conspirators are often maintained in these locations.

14

45. Individuals involved in drug trafficking often maintain large amounts of U.S. currency to maintain and finance their on-going drug business. In addition, assets generated by their drug business are typically kept on-hand by drug dealers to avoid detection by authorities and/or reporting requirements. Individuals involved in drug trafficking often attempt to legitimize the source of these profits. In order to do this, they attempt to secrete, transfer and conceal the money by, among other ways: (a) placing assets in names of nominees to avoid detection, while still maintaining control of the assets; (b) laundering money through what appears to be a legitimate business or businesses; (c) hiding money in their homes, safes, or safety deposit boxes; (d) and using money to buy assets that are hard to trace by law enforcement. Records of these transactions are often found in the aforementioned locations.

46. Additionally based on my training and experience and the training and experience of other investigators, I know persons involved in narcotic trafficking acquire personal and real property with their narcotic proceeds, and maintain evidence of financial transactions related to obtaining, transferring, secreting, or the spending of large sums of money made from drug trafficking activities. These records include bank statements, passbooks, money drafts, checkbooks, tax returns, loan statements, escrow files, and wire transfer records. Persons involved in drug trafficking will often convert the currency into cashier's checks, bearer bonds, precious metals, gold, diamonds, and other jewelry in an attempt to hide large amounts of currency, and that evidence of such will be located at the described locations.

47. Individuals involved in narcotics trafficking often take, or cause to be taken, photographs of themselves, their associates, their property, and/or their drugs, and usually maintain these photographs in the aforementioned locations.

48. Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, and/or in their vehicles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during drug transactions. These weapons and firearms can be used, and often are used, as an instrumentality of the crime of drug possession and distribution. Therefore, I am requesting permission to seize weapons, firearms, and ammunition that may be found at the premises or in the vehicles to be searched, as indicated in Attachment B attached to each of the locations requested.

49. Individuals involved in drug trafficking often conceal evidence of their involvement in vehicles and outbuildings to prevent detection and seizure by law enforcement conducting lawful search warrants at residences. Therefore, I am requesting

permission to search all vehicles and outbuildings located at each of the locations requested.

50. Your affiant further believes that persons involved in the distribution of drugs will store items, further described in Attachment B, which is incorporated herein by reference, and that those items are used by drug traffickers in furtherance of their drug trafficking, or are obtained by drug traffickers as a result of their drug trafficking.

51. Based on my training, experience, and conversations with other experienced agents, I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income. These methods include cash purchases, the purchasing of numerous monetary instruments with cash in amounts less than $10,000, the use of aliases and nominees, the use of businesses as "fronts" in an attempt to legitimize and conceal illegal activities, and the use of "off-shore" banking in an attempt to break the paper trail. These and other schemes are commonly referred to as "money laundering."

52. Individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accounts to complete financial statements and tax returns for their business and personal returns.

53. Persons engaged in illegal activities and/or money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records. Records of this kind are also often stored on computer media.

54. Persons engaged in illegal activities and/or money laundering often maintain such records for long period of time, particularly when they are involved in ongoing criminal conduct over a long period of time.

55. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (*e.g.*, financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, video

recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence.

56. Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, etc. Records of such instruments are routinely maintained at the individual's residence or place of business.

57. The terms "evidence" and "documents" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such evidence or documents, their drafts or their modifications may have been crated or stored.

*[Continued on the next page.]*

17

## **Request to Seal**

58. This Affidavit contains information regarding potential targets and informants, which if unsealed, may jeopardize the very information sought to be gained by these search warrants. In light of the on-going nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, your Affiant requests that this Affidavit and the resulting Search Warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation and a copy of the Search Warrant and an inventory of any items seized that will be left at the locations of the execution of the Search Warrants.

59. I hereby request that search warrants be issued for the property listed as Attachment A based upon the aforementioned facts.

I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information and belief.

Brian Nehring, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before
me on January 29, 2019,

Hon. KENDAL J. NEWMAN
United States Magistrate Judge

Approved as to form:

CAMERON L. DESMOND
Assistant U.S. Attorney

18

**Attachment A**
**Locations to be Searched**

The residence and property located at **1169 Lewis Avenue, Vallejo, California**, further described as a property located at the top left (east) side of an access road running south from Lewis Avenue; with a white wooden sign with the numerals 1169 displayed at the entrance to the access road; with a solid stucco-type fence running along the front of the property with lantern-type lights along the top of the fence; with a large single-story residence structure, tan stucco in color, set back from the street, with a main apparent entrance door on the left side of the front of the main structure with a white security gate facing west, with a garage door in the middle of the structure with a white placard with the numerals 1169 affixed to the front to the left of the garage door; with a separate white wooden entrance door on the right side of the structure; and with two large wooden sheds along the south side of the main structure to the rear.

Including the residence, garage, all storage areas, all trash receptacles, and the entire grounds and yard.

Photographs of the property to be searched:











## Attachment B
## Items to be Seized

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by Henry BENSON and/or Roselle CIPRIANO and their co-conspirators:

- 21 U.S.C. §§ 841(a)(1) and 846: conspiracy to manufacture and distribute a mixture and substance containing at least 50 grams of a mixture and substance containing methamphetamine, Schedule II Controlled Substance and

- 21 U.S.C. § 841(a)(1): manufacture and distribution of a mixture and substance containing at least 50 grams of a mixture and substance containing methamphetamine, a Schedule II Controlled Substance.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. I have learned from my training and experience that traffickers who engage in the manufacture of counterfeit pharmaceutical tablets or tablets containing controlled substances or dangerous drugs, often have at their residence or areas under their control, controlled substances or dangerous drugs, including Methamphetamine in this case; binders and other chemicals used in combination with controlled substances to create counterfeit pharmaceutical tablets or tablets containing controlled substances or dangerous drugs; pill presses; parts for pill presses; dies and molds, mold trays, tables, measuring devices, grinders, mixers, storage containers, and similar items used in the creation of chemical mixtures and the pressing of the mixtures into tablets; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting and cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags and containers; and surgical gloves;

2. United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase methamphetamine during this investigation;

3. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4. Cellular telephones and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

5.    Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6.    Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.    Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.    Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.    Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.   Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person; and

11.   Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.